NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

—————————————————————
                                    :
DONALD PALISAY,                     :
                                    :
            Plaintiff,              :         Civil Action No. 11-4857
                                    :
      v.                            :         **OPINION**
                                    :
                                    :
COMMISSIONER OF SOCIAL              :
SECURITY,                           :
                                    :
            Defendant.              :
                                    :
—————————————————————               :

PISANO, District Judge.

    Before the Court is the appeal of Donald Palisay ("Plaintiff") from the final decision of the

Commissioner of the Social Security Administration ("Commissioner") denying his request for

Disability Insurance Benefits ("DIB").  The Court has jurisdiction to review this matter pursuant

to 42 U.S.C. §§ 405(g) and 1383(c)(3) and reaches its decision without oral argument.  *See* Fed.

R. Civ. P. 78.  For the reasons set forth herein, the Court finds that the record provides

substantial evidence to support the Administrative Law Judge's ("ALJ") decision, and therefore

affirms the final decision of the Commissioner.

## I.     PROCEDURAL HISTORY

    Plaintiff filed an application for DIB on September 8, 2006, alleging disability beginning

May 17, 2000 due to arthritis, tendonitis, pain in the back, knees and shoulder, four knee

operations, depression, anxiety, and gout. (Administrative Record ("R.") 135).  Plaintiff's

application was denied both initially and upon reconsideration, and he subsequently filed a written request for a hearing on February 22, 2008. (R. 66, 72, 77).  On June 19, 2009, a hearing was held before ALJ Joel Friedman of Newark, New Jersey during which the date of disability onset was amended to January 12, 2002 (R. 13, 26).  On October 23, 2009, ALJ Friedman issued a decision finding Plaintiff not disabled from the amended onset date through December 31, 2007, the date on which Plaintiff's insured status expired. (R. 11-23).  Plaintiff sought Appeals Counsel review and was denied, rendering the ALJ's decision the final decision of the Commissioner. (R. 1-3).  Plaintiff filed a complaint in this Court alleging that the Commissioner's decision was not supported by substantial evidence.

## II.    BACKGROUND

### A. Non-Medical History

Plaintiff was born on June 17, 1960. (R. 110).  As of June 19, 2009, Plaintiff was 5' 10" and weighed approximately 280 pounds. (R. 34-35, 134).  He is married with two children and lives in Monroe, New Jersey. (R. 29-30).   Plaintiff completed high school and 128 college credits but received no degree. (R. 30). After completing the police academy in 1987, Plaintiff worked as a police officer for the Port Authority of New York and New Jersey until May 17, 2000, at which time he stopped working following operations on his knees.  (R. 30, 126, 135-136).  As a police officer, Plaintiff engaged in criminal arrests, traffic duty, train inspections, and drove a squad car. (R. 136).  The job required a range of activities including:  walking; standing; climbing; stooping; reaching; handling or grasping larger objects; writing, typing or handling small objects; and lifting and carrying objects or persons up to approximately 100 pounds.  (R. 136-137).

Plaintiff returned to work following the events of September 11, 2001 for emergency light duty. (R. 135).  Light duty required Plaintiff to answer phones. (R. 125, 135).  Plaintiff was also

present at the World Trade Center on September 11 and experienced the loss of 37 men from the Port Authority Police, 14 of whom were under Plaintiff's command. (R. 32).  Plaintiff's brother was also lost in the September 11 events. (R. 32).  Plaintiff discontinued light duty on December 7, 2001 when the emergency was deemed "not as acute." (R. 135).  Plaintiff officially retired on January 12, 2002 and receives a $5,000 monthly pension. (R. 35).  At the time of the hearing, Plaintiff was unemployed. (R. 35-37).

### B.  Medical History

### 1.  Physical Injuries

Plaintiff was examined by Dr. Mark Friedman after various work-related injuries occurring between 1993 and 1999. (R. 173-180).  In 1993, Dr. Friedman examined Plaintiff's injuries following two incidents at work. (R. 176).  He noted evidence of a previous laminectomy on Plaintiff's lower back and of a previous surgery to Plaintiff's left knee. (R. 176).  Dr. Friedman concluded that Plaintiff had incurred injuries to the neck, upper back, and mid-back as well as difficulty over the ulnar nerve. (R. 177).  Dr. Friedman also concluded that Plaintiff was left with a 30% impairment of the lower back. (R. 177).

On October 9, 1996, Plaintiff was examined by Dr. Friedman in relation to injuries incurred while directing traffic at the Newark Airport. (R. 178).   Following the incident, Plaintiff was out of work from March 1, 1995 until May 12, 1995. (R. 178).  Upon examination, Dr. Friedman noted weakness in Plaintiff's quadriceps and hamstrings, atrophy in the left thigh and calf, and difficulty squatting and walking. (R. 180).  Dr. Friedman concluded that Plaintiff had a 50% orthopedic partial permanent impairment of his left leg due to the February 1995 incident. (R. 180).

On January 20, 1999, Plaintiff was again examined by Dr. Friedman in relation to injuries incurred at work.  Following these injuries, Plaintiff was out of work from January 24, 1998 until February 24, 1998. (R. 173).  Dr. Friedman diagnosed Plaintiff with hamstring stretch with residual difficulty and strain to the right hamstring resulting in 10% partial permanent impairment of the right leg, sprain and crepitus to the right knee resulting in 10% partial permanent impairment of the right knee, and sprain and strain in lower back with sciatic nerve irritation resulting in a 50% partial impairment of the lower back. (R. 174).

Plaintiff was seen by Dr. Jeffrey Bechler, an orthopedic surgeon, beginning February 11, 2000. (R. 185).  Plaintiff first presented with an injury to his right knee sustained on February 2, 2000.  (R. 185).  Upon examination, Dr. Bechler noted tenderness over Plaintiff's lateral joint line, a positive Steinmann maneuver, trace knee effusion, stable ligaments, and a full range of motion.  (R. 185).  On February 29, 2000, Plaintiff returned to Dr. Bechler having received an MRI scan revealing a peripheral tear of the medial meniscus. (R. 185).  The tear, however, was not in the area in which Plaintiff complained of pain, and an observation period accompanied by some physical therapy was recommended (R. 185).  Plaintiff returned to the office one month later with some improvement.  (R. 186).  At this time, Plaintiff was working on light duty restriction. (R. 186).  Upon examination, Dr. Bechler noted remaining tenderness over the lateral joint line but some improvement. (R. 186).

During his visit on April 27, 2000, Plaintiff continued to complain of pain outside the right knee, tenderness over the lateral joint line, and small knee effusion; diagnostic arthroscopy was recommended. (R. 186).  The procedure took place May 17, 2000 and a partial lateral meniscectomy was performed.  (R. 186).  The surgery further revealed that Plaintiff had early arthritis in the patellofemoral joint and mild changes over the medial facet of the patella. (R.

186).  Plaintiff received physical therapy and continued to recover well. (R. 186).   On June 29, 2000, it was recommended that Plaintiff return to light duty work as of July 5, 2000. (R. 186).

On July 13, 2000, Plaintiff returned to discuss the condition of his left knee. (R. 187). Plaintiff complained of buckling, locking and giving-way of the knee. (R. 187).  At this time, the right knee had recovered sufficiently. (R. 187).  Plaintiff obtained an MRI of the left knee on July 5, 2000 that revealed a tear of the posterior horn of the medial meniscus. (R. 187). Examination that day revealed tenderness over Plaintiff's medial joint line, a mildly positive rotatory sign, and a stable knee. (R. 187).   During a visit August 4, 2000, Plaintiff indicated that the right knee was doing well, that pain remained in the left knee, and that he had experienced problems in the left knee while playing golf in Florida. (R. 187).  Plaintiff indicated that he was unable to work in this condition and underwent arthroscopic surgery of his left knee on August 23, 2000. (R. 187).  The procedure revealed a tear of the medial meniscus remnant as well as arthritic changes in the medial compartment that were moderately advanced. (R. 187).  Plaintiff returned for required post-operation visits, continued physical therapy, and remained out of work. (R. 187, 190-198).

Plaintiff continued to see Dr. Bechler monthly. (R. 187- 188).  Plaintiff complained of problems with prolonged sitting, stair climbing, and other increased activity; however, his examinations remained basically unchanged. (R. 188).  Dr. Bechler noted that his range of motion was unaffected, there was no swelling to the knees, but there was diffuse tenderness through both knees. (R. 188, 190-198).  In his last visit on August 3, 2001, Plaintiff stated that his knees were feeling better and that he had played tennis the previous day. (R. 188).  At this time, Plaintiff was currently working light duty. (R. 188).  Examination revealed full range of motion of both knees, no significant swelling, stable knees when subject to ligamentous testing,

slight varus inclination, and some tenderness over the medial joint line. (R. 188).  The last two observations were more prevalent in the left knee than the right. (R. 188).

The final assessment by Dr. Bechler, as indicated in his narrative report dated September 21, 2001, was that Plaintiff had experienced tears of the lateral meniscus and the remnant of the medial meniscus in the right and left knees respectively. (R. 188).  These injuries necessitated arthroscopic meniscetomies which, when performed, revealed mild to early moderate osteoarthritis in Plaintiff's knees. (R. 188).  Dr. Bechler opined that Plaintiff had reached a point of maximum medical improvement and indicated that it might be beneficial for him to pursue a light-duty position. (R. 188).  Dr. Bechler anticipated that no additional surgeries would likely be required; however, Plaintiff would require anti-inflammatory medication for the osteoarthritis which was likely to progress (R. 188, 200).

Plaintiff saw doctors at the Health Care Association ("HCA") in Old Bridge, New Jersey beginning in 1989. (R. 138).  This is the location of Plaintiff's primary physician (R. 138).  On November 11, 2002, Plaintiff was diagnosed with gout in his right toe. (R. 209).  Plaintiff returned later that month complaining of joint pain in his back and knees as well as depression. (R. 209).  Plaintiff was placed on Prevacid, Zylopamm, and Vioxx following these visits. (R. 209).  In December of 2002, doctors at HCA noted that Plaintiff stated he was feeling better. (R. 204).  On January 15, 2003, notes indicate that Plaintiff still had slight pain in the right foot.  (R. 204).  On October 25, 2004, Plaintiff presented with a sore throat, cough, and clogged ears, and in December of that same year Plaintiff complained of clogged ears, swollen glands, and a cough. (R. 204).  In April of 2005, Plaintiff complained of depression and was placed on medication. (R. 211).  In November of 2005, Plaintiff complained of a cough, swollen glands and

a sore throat. (R. 203).  He was placed on Zyrtec and Robitussin. (R. 203).  On the follow up

visit, Plaintiff had chest congestion, swollen glands, and post nasal drip. (R. 203).

On April 5, 2007, Dr. Ronald Bagner dictated an orthopedic consultative examination report

acknowledging that Plaintiff ambulated without difficulty, got on and off the examination table

with moderate difficulty, dressed and undressed without assistance, was not uncomfortable in the

seated position during the interview, did not use a cane or crutches to walk, and could heel to toe

walk.  (R. 221).  Dr. Bagner further noted that the upper extremities showed a normal range of

movement, that there was three centimeters atrophy to the left thigh, pain in the left knee and

crepitus on movement of the left knee, and no effusion but localized tenderness of the left knee.

(R. 222).  The right knee was stable with a normal range of movement and no effusion or

localized tenderness.   (R. 222).

On April 30, 2007, Dr. Deogracias Bustos reviewed the record and gave the initial

physical Residual Functioning Capacity ("RFC") Assessment. (R. 226).  He concluded that

Plaintiff could occasionally lift a maximum of 20 pounds, frequently lift a maximum of 10

pounds, stand and/or walk with normal breaks for a period of 6 hours of an 8 hour work day, and

push and/or pull without limitation. (R. 227).  Dr. Bustos' report noted that Plaintiff could never

climb ladders, ropes, or scaffolds, but could occasionally climb ramps or stairs, balance, stoop,

kneel, crouch, or crawl.  (R. 228).  Dr. Bustos noted no manipulative, visual, communicative, or

environmental limitations. (R. 229-230).

2.  **Mental Conditions**

In addition to physical ailments, Plaintiff has received treatment for mental health conditions.

(R. 219-220, 246-266, 271-276).  Plaintiff sought treatment with Dr. Carolynn Matflerd from

2005 to 2006. (R. 237-245).  In his initial appointment on May 19, 2005, Plaintiff stated that he

felt he had become distant from his wife and kids following the events of September 11, 2001. (R. 241).  Plaintiff indicated that he had put off treatment because he thought he could handle everything and he did not want to be on medications. (R. 241).  Dr. Matflerd noted that during the exam Plaintiff was casually dressed, cooperative, and engaging. (R. 243).  She diagnosed Plaintiff with Axis I:  Post Traumatic Stress Disorder ("PTSD") and Axis III:  4 knee surgeries, back, and arthritis, and gout.[1] (R. 245).  During his appointments in June and July of 2005, Plaintiff noted little to no change in his condition. (R. 240).  Plaintiff did not attend his scheduled appointment in August of 2005. (R. 239).  On September 27, 2005, Plaintiff indicated that he was feeling better. (R. 239).  He stated that he still woke up with nightmares, but things were clearer now. (R. 239).  On December 15, 2005, Plaintiff told Dr. Matflerd that the day was "pretty good." (R. 238).  Plaintiff did not attend his scheduled appointment on March 7, 2006. (R. 238).

Plaintiff began visits with Dr. Maher Awad on October 21, 2006. (R. 264).  Dr. Awad noted that he treated Plaintiff for depression and anxiety and prescribed Zoloft.  (R. 264). Plaintiff was last seen by Dr. Awad on September 15, 2007. (R. 264).  During that visit, Plaintiff reported that he does not have nightmares anymore and is less angry, but that he remains depressed and unmotivated. (R. 264).  Plaintiff indicated he still has flashbacks of the events of September 11, 2001. (R. 264).

In a report dated May 13, 2009, Dr. Awad stated that he diagnosed Plaintiff with Axis I Major depression and PTSD, Axis II deferred, Axis III knee and back injuries and chronic pain,

---

[1] The *Diagnostic and Statistical Manual of Mental Disorders* describes a mutliaxial system.  Each of these axes "refers to a different domain of information that may help the clinician plan treatment and predict outcome." Axis I refers to clinical syndromes. Axis II refers to personality disorders and mental retardation.  Axis III refers to general medical conditions.  Axis IV refers to psychosocial and environment problems.  Axis V refers to global assessment of functioning.  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 27 (Am. Psychiatric Ass'n, 4th ed. Text Revision 2000).

Axis IV physical disability, and Axis V 50-55. (R. 265).  Dr. Awad recommended that Plaintiff continue with therapy and continue Zoloft and Xanax. (R. 266).  Dr. Awad noted that Plaintiff seemed less depressed, but he still indicated that he was not motivated. (R. 264).  Concentration was noted to be okay throughout the interview, memory intact, intellectual functioning normal, and insight and judgment fair. (R. 265).  Dr. Awad opined that Plaintiff was unable to work due primarily to physical injury. (R. 266).  He further noted that Plaintiff's ability to make occupational adjustments was very good in all categories and fair in the areas of interacting with supervisors and work stress. (R. 274).  Dr. Awad indicated that Plaintiff was fair at understanding, remembering and carrying out simple, detailed and complex job instructions. (R. 275).  With respect to personal social adjustments, Dr. Awad indicated Plaintiff was unlimited in the areas of maintaining personal appearance, behaving in an emotionally stable manner and demonstrating predictably.  (R. 275).  Dr. Awad recommended a low stress job because of Plaintiff's limited concentration.  (R. 276).

Plaintiff has also seen Holly Greye, a licensed clinical social worker, weekly since January of 2004. (R. 271).  She indicated that although Plaintiff is still depressed, his symptoms were no longer severe and he is maintained on Zoloft and Xanax. (R. 271).  Ms. Greye noted that Plaintiff sees Dr. Awad every three months for management of this medication. (R. 271).  Ms. Greye stated that the depression and PTSD is causally related to the incidents of September 11, 2001, and that prior to these attacks Plaintiff functioned well in his job until forced into retirement by physical injury. (R. 271).  Ms. Greye indicated that Plaintiff could perform tasks associated with daily living but is unable to sit or stand for extended periods of time. (R. 271).  She opined that physical limitations in combination with psychological impairment made employment unlikely. (R. 271).

A review of the psychiatric record by Dr. Joan Joynson on May 8, 2007 found that Plaintiff did not meet the Listed Impairments but was affected by Dysthymia in the category of Affective Disorders (R. 249) and PTSD in the category of anxiety-related disorders (R. 251).  In terms of functional limitations, Dr. Joynson indicated mild limitations in daily living and social functions, moderate limitations in maintain concentration, persistence or pace, and no episodes of decompensation of extended duration. (R. 256).  Dr. Joynson found that evidence did not establish the "C" criteria necessary to meet a Listed Impairment. (R. 257).  Therefore, the mental RFC assessment conducted by Dr. Joynson found that Plaintiff was only moderately limited in his ability to maintain attention and concentration for extended periods and to complete a normal work-day and work week without interruptions from psychologically-based symptoms. (R. 260). Otherwise, Plaintiff was not significantly limited. (R. 260-261).  Dr. Joynson noted that Plaintiff had fairly high functioning and was primarily limited by physical problems. (R. 262).

### C.  Testimonial Evidence

Plaintiff's wife submitted a Third Party Function report. (R. 143).  This report indicated that Plaintiff can no longer play sports, does not go out socially as much, cries every day, and is difficult to talk to. (R. 143).  A typical day for Plaintiff would be to get up, have coffee, read the paper, go on the computer, watch his son's games, lay on the couch to rest, eat dinner, rest, and go to bed. (R. 143).  She indicated that he dresses slowly and has difficulty remembering to take his medicine. (R. 145).  She noted that Plaintiff goes outside daily unless he is depressed, can drive a car, can go out alone, and can shop. (R. 146).  She also noted that he pays bills and handles money. (R. 146).  Plaintiff's hobbies, as indicated by his wife, include:  reading, television, computer, and watching sports. (R. 147).  She noted that Plaintiff goes to friends'

houses to play cards and watch sports games once a week. (R. 147).  Plaintiff also attends his children's sporting events (R. 147).

 With regard to the impact his injuries had on his ability to function, Plaintiff testified in his hearing before the ALJ the following:  that when he sits for longer than a 15-20 minute period he has to get up and stretch; that he has sciatic pain down both legs, primarily the left leg which often requires him to lay down for a little while; that he still gets night terrors and tremors as a result of the 9/11; and that he does not think he could concentrate to execute very simple jobs. (R. 30-31).  Plaintiff stated that he was currently taking Zoloft, Abilify, and Xanax. (R. 33).  Plaintiff later noted that he takes Allopurinol for gout, Lipitor for cholesterol, and other various pain medications. (R. 34).  Plaintiff indicated that he is in pain 24 hours a day. (R. 33).  Plaintiff testified that there are occasions, two or three times a month, where he is stuck in bed and unable to move due to pain. (R. 34).  Describing a typical day, Plaintiff stated that he usually goes to sleep around 11:00 p.m., wakes up at 3:00 a.m., tries to go back to sleep, wakes up again at 6:00 a.m. with his son, lies back down, gets up and tries to do small tasks around the house but cannot do much. (R. 36-37).  Plaintiff stated that he does not attend the movies because he does not like people. (R. 38).  Plaintiff testified that he could probably walk a couple of blocks, lift approximately ten pounds, and stand for about 15 to 20 minutes before he would need to sit. (R. 39-40).  Plaintiff further testified that he would be unable to sit in a job for six hours unless he had the opportunity to lie down for a while. (R. 41).  Plaintiff also testified that he has difficulty concentrating and that he sees a therapist weekly. (R. 42).

 At the hearing, testimony was heard by Pat Green, a vocational rehabilitation counselor, who indicated that the hypothetical person, similar to Plaintiff, if limited to simple, routine, low stress jobs with low contact with the general public, would be unable to engage in Plaintiff's past

work. (R. 46).  However, Green listed mutual ticket checker, sorter, addresser or stamper, and toy stuffer as occupations existing in the national economy considered to be unskilled sedentary level positions that are low stress and simple with no major decision-making.  (R. 47-48).  Green further testified that needing to stand up and stretch would not pose a problem in these jobs provided it was not for long periods. (R. 48).  In any of these occupations, Green testified that a person would likely to have to work at least 6 hours of the 8 hour day.  (R. 49).

## III.    STANDARD OF REVIEW

A reviewing court must uphold the final decision of the Commissioner if it is supported by "substantial evidence." 42 U.S.C. § 405(g); § 1383(c)(3); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992).  Substantial evidence requires more than a "mere scintilla" of evidence. *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 220 (1938).  It may; however, be less than a preponderance of the evidence. *Stunkard v. Sec'y of Health & Human Servs.,* 841 F.2d 57, 59 (3d Cir. 1988).  This inquiry does not require that the reviewing court would have rendered the same decision, but rather that the conclusion of the Commissioner was reasonable given the record before him. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).

The reviewing court must review the evidence in its entirety. *See Daring v. Heckler,* 727 F.2d 64, 70 (3d Cir. 1984).  In order to do so, the court "must 'take into account whatever in the record fairly detracts from its weight.'" *Schonewolf v. Callahan,* 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting *Wilibanks v. Sec'y of Health & Human Servs.*, 847 F.2d 301, 303 (6th Cir. 1988)).  The administrative decision should provide a "clear and satisfactory explanation of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  When the record demonstrates conflicting evidence, the administrative decision "must adequately explain in the record his reasons for rejecting or discrediting the competent evidence." *Ogden v. Bowen*, 677 F.

Supp. 273, 278 (M.D. Pa. 1987) (citing *Brewster v. Heckler*, 786 F.2d 581 (3d Cir. 1986)).  In

fact, it is imperative to a meaningful review for the Court to have access to the Commissioner's

reasoning:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently
> explained the weight he has given to obviously probative exhibits, to say that his
> decision is supported by substantial evidence approaches an abdication of the
> court's duty to scrutinize the record as a whole to determine whether the
> conclusions reached are rational.

*Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978) (quoting *Arnold v. Sec'y of Health,*

*Educ. & Welfare*, 567 F.2d 258, 259 (4th  Cir. 1977)).  Nevertheless, the district court is

not "empowered to weigh the evidence or substitute its conclusions for those of the

factfinder." *Williams,* 970 F.2d at 1183 (citing *Early v. Heckler*, 743 F.2d 1002, 1007 (3d

Cir. 1984)).

### A.  Establishing Disability

An individual is eligible for DIB benefits if he is unable to "engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To constitute a disability, the physical

and mental impairments must be "of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations provide a five-step, sequential evaluation procedure to determine

whether a claimant is disabled.   *See* 20 C.F.R. § 404.1520.  For the first two steps, the claimant

must establish:  (1) that he has not engaged in "substantial gainful activity" since the onset of the

alleged disability and (2) that he suffers from a "severe impairment" or "combination of

impairments." 20 C.F.R. § 404.1520(a)-(c).  The burden of establishing these first two requirements is on the claimant, and failure to satisfy either standard automatically results in a denial of benefits.  *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

Upon satisfaction of these initial burdens, the claimant at step three must provide evidence that his impairment meets or equals one of the impairments listed in Appendix 1 of the regulations. 20 C.F.R. § 404.1520(d).  The impairments listed in Appendix 1 are presumed severe enough to satisfy disability and the claimant is automatically entitled to disability benefits. *Id*; 20 C.F.R. § 404, Subpart P, Appendix 1. If a claimant fails to demonstrate an impairment equal or above those listed, the analysis proceeds to steps four and five.

The fourth step of the analysis focuses on whether the claimant possesses the residual function capacity ("RFC") to sustain his "past relevant work." 20 C.F.R. § 404.1520(e).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairments." 20 C.F.R. § 404.1545(a). An individual who is found to be able to return to his previous work is not disabled and, therefore, not entitled to benefits.  The burden of proof at this step of the analysis remains on the claimant. *Fargnoli v. Halter*, 247 F.3d 34, 39 (3d Cir. 2001). If the claimant is unable to return to his previous work, then the analysis proceeds to the final step.

At step five the burden shifts to the Commissioner to demonstrate that the claimant can perform other work, considering his residual functional capacity, age, education, and work experience.  If the claimant is able to do other work, he is not disabled.  20 C.F.R. § 404.1520(g). If the Commissioner fails to satisfy this burden, the claimant is considered "disabled." *See Yuckert*, 482 U.S. at 146-47 n.5.

**B.  Objective Medical Evidence**

Under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq.* and 42 U.S.C. §

1381 *et seq.,* a claimant is required to provide objective medical evidence to prove his disability.

42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless

he furnishes such medical and other evidence of the existence thereof as the Commissioner of

Social Security may require."); 42 U.S.C. § 1382c(a)(3)(H)(i) ("In making determinations with

respect to disability under this subchapter the provisions of [42 U.S.C.] § 423(d)(5)(A) of this

title shall apply in the same manner as they apply to determinations of disability under

subchapter II of this chapter.").  Therefore, a plaintiff cannot prove disability based solely on

subjective complaints.  *See Green v. Schweiker*, 749 F.2d 1066, 1069-70 (3d Cir. 1984)

("[S]ubjective complaints of pain, without more, do not in themselves constitute disability.").

An individual must provide medical findings that demonstrate a medically determinable

impairment.  *See id.*; *see also*  42 U.S.C. § 423(d)(1)(A) (defining "disability" as an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment."); 42 U.S.C. § 1382c(a)(3)(A)(same).

**IV.     ALJ DECISION**

On June 19, 2009, a hearing was held before ALJ Joel Friedman in Newark, New Jersey. (R.

11).  At this hearing, testimony was given by both Plaintiff and Pat Green, a vocational expert.

(R. 26-63).  In a written decision dated October 23, 2009, ALJ Friedman denied Plaintiff's claim

for DIB, concluding that through the date last insured he was capable of adjusting to other work

that existed in substantial numbers in the national economy and, therefore, was not disabled. (R.

23).

After reviewing the evidence in the record, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act on December 31, 2007. (R. 13).  Proceeding to the five-step analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity from the amended date of alleged disability onset, January 12, 2002, through the date last insured, December 31, 2007. (R. 13).  The ALJ acknowledged that Plaintiff discontinued work prior to September 11, 2001, engaged in some light duty work following the events of September 11, but ultimately stopped working upon retirement on January 12, 2002. (R. 13).

Turning to step two, ALJ Friedman determined that Plaintiff was afflicted with the following severe impairments:  "Degenerative Joint Disease (knees); Obesity; Post Traumatic Stress Disorder (PTSD); and Depression." (R. 13).  In making this finding, the ALJ acknowledged that these impairments caused significant limitations on Plaintiff's ability to perform work-related activities. (R. 13).

At step three of the analysis, the ALJ found that Plaintiff did not have an impairment, or a combination of impairments, that met or were medically equivalent to one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 13).  ALJ Friedman concluded that Plaintiff's knee impairment did not meet the requirements of Listing 1.02 because it was not "characterized by gross anatomical deformity (e.g. subluxation contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joints, and finding on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joints." (R. 14).

With respect to Plaintiff's mental impairments, Post Traumatic Stress Disorder and Depression, the ALJ found that the impairments did not singly or in combination meet the requirements of 12.04 or 12.06. (R. 14).  The ALJ concluded that the "paragraph B" criteria were

not satisfied, noting that Plaintiff had only mild restrictions on his daily living, moderate difficulties in social functioning, moderate difficulties with respect to concentration, persistence or pace, and no episodes of decompensation of extended duration. (R. 14). As the mental impairments did not cause at least two of these "marked" limitations or one "marked limitation" and "repeated" episodes of decompensation, criteria for "paragraph B" were not met. (R. 14). Turning to "paragraph C" criteria, the ALJ determined that the evidence failed to establish the presence of these criteria as well. (R. 14).

Noting no specific medical listing regarding obesity, the ALJ indicated that he considered Plaintiff's obesity as was required by SSR 02-1p. (R. 14-15). ALJ Friedman stated that his decision regarding the inadequacy of Plaintiff's impairments to meet an Appendix 1 Listing was made after having "fully considered obesity in the context of the overall record evidence." (R. 14-15).

Prior to reaching step four, the ALJ determined Plaintiff's RFC. (R. 15). While acknowledging the opinion of State physician Dr. Bustos that Plaintiff was capable of light work with occasional postural and environmental limitations, the ALJ found, considering additional evidence as well as claimant's obesity, that Plaintiff would be limited to sedentary work as defined in 20 C.F.R. 404.1567(a) and limited to low stress and low contact occupations. (R. 15, 20). The ALJ further noted Plaintiff's postural and environmental limitations as described in Dr. Bustos' RFC assessment: occasional climbing of ramps or stairs, but never ladders, ropes or scaffolds; and occasional balancing, stooping, kneeling, crouching, and crawling, but not involving exposure to dangerous machinery or unprotected heights. (R. 15, 20).

In making this finding, the ALJ noted that he considered all symptoms to the extent that they were consistent with the objective medical requirements. (R. 15). While acknowledging that

17

Plaintiff's medically determinable impairments may reasonably be expected to produce the pain or symptoms described by Plaintiff, the ALJ concluded that Plaintiff's statements regarding the intensity or persistence of these symptoms were not credible. (R. 15).

The ALJ noted that Plaintiff's diagnosis was "mild" osteoarthritis of the knees and that there was no description of the debilitating or degenerative nature of this condition. (R. 19). The ALJ accorded weight to Dr. Bechler's medical reports noting that the most current imaging of Plaintiff's knees demonstrated that the left knee was normal, that there was an old injury in the right knee, and that there was no acute radiographic abnormality (R. 19). The ALJ also gave weight to the report of Dr. Bagner. (R.19). While Dr. Bagner found crepitus in Plaintiff's left knee, atrophy in the left thigh, and pain and crepitus in the right knee, he also indicated that Plaintiff retained the ability to heel to toe walk, had a normal range of motion in the knees, and performed transfers on and off the examination table without difficulty. (R. 19).

As for the alleged symptoms, the ALJ found inconsistencies with Plaintiff's testimony, the Third Party Functioning Report, and Plaintiff's subjective complaints. The ALJ noted Plaintiff's testimony that he woke up in the morning with his children and attempted household tasks. (R. 20). The ALJ further noted that the Third Party Functioning Report submitted by Plaintiff's wife indicated that Plaintiff uses the computer, watches television, tries to help with housework, gets out "usually" every day, drives a car, attends his son's sports events, and goes to friends' houses weekly. (R. 20). Based upon this evidence, the ALJ concluded that the documentary evidence and Plaintiff's daily activities contradicted Plaintiff's subjective complaints and, thus, they should not be accorded significant weight. (R. 20).

Addressing Plaintiff's mental impairments in relation to Plaintiff's RFC, the ALJ determined that the mental impairments of Plaintiff had no greater impact than to limit him to simple routine,

18

low stress, low public contact occupations. (R. 20). The ALJ noted the absence of evidence of thought disorders, memory problems, suicidal or homicidal ideations, hallucinations or delusions, problems with alertness, attention span, distractibility, decision-making, or impulsivity. (R. 20). Therefore, though Plaintiff had some mental deficits, the ALJ concluded that the impact was not severe enough to preclude work activity. (R. 21).

The ALJ acknowledged the opinions of Plaintiff's treating psychiatrist and therapist that Plaintiff was unable to work; however, he did not afford these significant weight because their assessments were based, at least in part, on Plaintiff's physical impairments, an area which was not their "province." (R. 21). The ALJ gave weight to the opinion of Dr. Awad that Plaintiff would need a low stress job, and to the opinion of Dr. Joynson, the DDS consultant, who found Plaintiff capable of sustaining adequate concentration, persistence, and pace following simple directions, adapting to workplace changes, and responding to supervision. (R. 21).

Utilizing the RFC determination above, the ALJ concluded that, although Plaintiff was unable to perform past relevant work, there were jobs that existed in significant number in the national economy that Plaintiff could have performed. (R. 22). In drawing this conclusion, the ALJ relied on the testimony of the vocational expert who stated that an individual with the same characteristics as Plaintiff would have been able to perform the occupations of pari-mutuel ticket checker, addresser or stamper, sorter, and toy stuffer. (R. 23). Based upon this testimony, the ALJ concluded that, through the date last insured, Plaintiff was capable of successfully adjusting to other work that was available within the national economy; therefore, he was not disabled. (R. 23).

## V.    LEGAL DISCUSSION

Plaintiff contends in this appeal that the ALJ's decision erred in three ways.  First, he alleges that the ALJ's decision neither complies with the requirements of a step three analysis nor observes the Commissioner's special requirements when obesity is considered a severe impairment.  Second, Plaintiff argues that the ALJ's RFC determination is simply a "collection of stock phrases and off-the-rack analysis."  Finally, Plaintiff asserts that the Commissioner did not meet his burden at the fifth step of the sequential analysis.

### A.  The ALJ's Step Three Analysis

Plaintiff asserts that the ALJ erred in concluding that his impairments or combination of impairments neither met nor medically equaled one of the Listings in Appendix 1. (Pl. Br. 10). Plaintiff argues that the decision fails to identify the elements of Listing 1.02A[2] that were not met by Plaintiff's orthopedic impairments and further fails to supplement those deficiencies by considering Plaintiff's obesity. (Pl. Br. 17, 18).  Plaintiff also argues that the decision fails to analyze the "paragraph B" and "paragraph C" criteria necessary to meet Listings 12.04[3] and 12.06[4] and further fails to consider the effects of obesity on those dual mental impairments. (Pl. Br. 20).

---

[2] Listing 1.02A, major dysfunction of a joint, is "characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)."  Subsection A requires, "Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b."

[3] Listing 12.04, Affective Disorders, is "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

[4] Listing 12.06, Anxiety Related Disorders, is characterized by anxiety that is "either the predominant disturbance or it is experienced if the individual attempts to master symptoms."  Examples of anxiety experienced in an individual's attempt to master symptoms include symptoms that present when the individual confronts with "the dreaded object or situation in a phobic disorder" or when the individual resists "the obsessions or compulsions in obsessive compulsive disorders."

As set forth above, Plaintiff bears the burden of proof at step three of the analysis. *See, e.g.*, *Bowen,* 482 U.S. at 146 n.5; *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir.2004). Plaintiff must demonstrate that his impairment meets or equals a listed impairment in Appendix 1. *See* 20 C.F.R. § 416.920(d). If the ALJ determines that an impairment does not match a listing, he must offer a sufficient framework of reasoning for a court to conduct "meaningful judicial review" of the ALJ's decision. *See Burnett v. Commissioner of Social Security Administration*, 220 F.3d 112, 120 (3d Cir. 2000); *see also Cotter*, 642 F.2d at 704 (an ALJ must provide a "clear and satisfactory explanation of the basis on which it rests"). He need not, however, "use particular language or adhere to a particular format in conducting the analysis." *Jones*, 364 F.3d at 505.

The step three inquiry as to whether the impairment is medically equivalent to an impairment listed in Appendix 1 allows for the combination of impairments. *See* 20 C.F.R. § 404.1526(b) ("If you have a combination of impairments, no one of which meets a listing, we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairments are at least of equal medical significance to those of a listed impairment, we will find that your combination of impairments is medically equivalent to that listing."). Furthermore, at step three the ALJ is also required to consider a claimant's obesity. *See Diaz v. Commissioner of Social Sec.*, 577 F.3d 500, 503 (3rd Cir. 2009). In that regard, although the Commissioner rescinded Paragraph 9.09 of the Appendix 1 Listing of Impairments which dealt exclusively with obesity in 2000, this did not eliminate obesity as a possible cause of disability. *Id.* Indeed, the Commissioner subsequently issued SSR 00-3p, which indicated how obesity should be considered. *Id.* While Paragraph 9.09 provided for an automatic designation of obesity as a listed impairment determined by height and weight, SSR 00-3p required an individual

analysis of the combined effect of obesity and other severe impairments. *Id.*  SSR 00-3p was

superseded, with little material alteration, by SSR 02-1p, which states:

> Because there is no listing for obesity, we will find that an individual with obesity 'meets' the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing. We will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing. For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing. This is especially true of musculoskeletal, respiratory, and cardiovascular impairments. It may also be true for other coexisting or related impairments, including mental disorders.

SSR 02-1P; *see also Diaz*, 577 F.3d at 505 (noting that where obesity was urged and

acknowledged by the ALJ as a severe impairment, it "was required to be considered alone and in

combination with her other impairments at step three.").

Here, the Court concludes that the ALJ's decision represents a proper step three analysis and

that substantial evidence supports the ALJ's finding that Plaintiff's impairments did not meet or

medically equal an Appendix 1 Listing.  In his decision, the ALJ specifically indicated that

Listings 1.02, 12.04, and 12.06 were considered and that the evidence failed to establish an

impairment that met these criteria. (R. 14)  Further, the ALJ stated his consideration of obesity

in rendering his decision on the satisfaction of each Listing. (R. 14-15)  The ALJ combined each

impairment with obesity, pursuant to SSR 02-1p, prior to determining that the impairment did

not medically equal an Appendix 1 Listing. (R. 14-15)   With respect to Listing 1.02, the ALJ

stated that evidence failed to "establish a knee impairment characterized by gross anatomical

deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other

abnormal motion of the affected joint(s), and findings appropriate medically acceptable imaging

of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)." (R. 14)  Thus,

the ALJ justified his conclusion by acknowledging the absence of a required element of the

Listing.  The ALJ also expressly considered this impairment in accordance with SSR 02-1p, acknowledging that, "Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment." (R. 15).  Upon full consideration of obesity in the context of the overall record, the ALJ found that the Listing was not met. (R. 15).

Furthermore, the Court concludes that substantial evidence supports the ALJ's conclusion. Of particular relevance are the most recent reports of Plaintiff's physical condition by Dr. Bechler and Dr. Bagner, on September 21, 2001 and April 5, 2007 respectively.  Dr. Bechler indicated that Plaintiff remained able to perform light work. (R. 188).   Dr. Bagner indicated that Plaintiff was able to heel and toe walk, had a normal range of motion in the knees with no effusion, tenderness or instability, and could move on and off the examining table with moderate difficulty. (R. 19, 200, 222).  With respect to the impairment in combination with obesity, none of the medical reports submitted mention an exacerbation of Plaintiff's conditions by his obesity. (R. 173-266).  Nor does Plaintiff's own testimony indicate that his obesity had a deleterious effect on his existing conditions. (R. 29-49).  In fact, Plaintiff's disability report outlining the injuries, illnesses, or conditions that limit his ability to work mentions only arthritis, tendonitis, back pain, pain in the knees, shoulder pain, knee operations, depression, anxiety, and gout, but not obesity. (R. 135).  Notably, Plaintiff fails to identify any evidence of record that would contradict the ALJ's finding that Plaintiff's obesity does not render Plaintiff's impairment medically equivalent to an Appendix 1 Listing.  Therefore, the ALJ conducted a proper step three analysis of Listing 1.02 and substantial evidence supports his conclusion.

With respect to Plaintiff's mental impairments, the ALJ stated that he considered the impairments "singly and in combination" before concluding that no Appendix 1 Listing was met.

(R. 14).  Satisfaction of criteria for Listing 12.04 requires that the impairment meet both the "paragraph A" and "paragraph B" criteria *or* the "paragraph C" criteria. 20 C.F.R. § 404, Subpart P, Appendix 1.  To meet Listing 12.06, the impairment must satisfy both "paragraph A" and "paragraph B" criteria *or* both "paragraph A" and "paragraph C" criteria. 20 C.F.R. § 404, Subpart P, Appendix 1.  In his decision, the ALJ specifically stated that "paragraph B" and "paragraph C" criteria are absent for both impairments, rendering them unequal to an Appendix 1 Listing. (R. 14).  Thus, the ALJ justified his conclusion by noting the absence of these necessary elements.

In his analysis, the ALJ appropriately identified the "paragraph B" criteria necessary for both the 12.04 and 12.06 Listings, stating that they require mental impairments "that result in at least two of the following:  marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." (R. 14).  In defining this further, the ALJ noted that "marked limitations means more than moderate but less than extreme." (R. 14).   Applying this to Plaintiff's impairments, the ALJ indicated that the evidence suggested that Plaintiff had moderate difficulties in social functioning, mild restrictions in daily living, and no episodes of extended decompensation; therefore, his impairments did not rise to the level necessary to meet the "paragraph B" requirements. (R. 14).   With respect to "paragraph C" requirements of the Listings, the ALJ found that the record evidence failed to establish the presence of these criteria. (R. 14).  Accordingly, the ALJ provided "a clear and satisfactory explanation" of his decision. *Cotter*, 642 F.2d 700, 704 (3d Cir. 1981).

Addressing the effect of obesity on Plaintiff's mental impairments, the ALJ again acknowledged the absence of a medical listing regarding obesity and considered Plaintiff's

obesity pursuant to SSR 02-1p. (R. 14).  The ALJ explicitly stated that he fully considered

obesity in finding that evidence failed to establish each Appendix 1 Listing considered. (R. 15).

Furthermore, the Court concludes that substantial evidence supports the ALJ's conclusions

with respect to Listings 12.04 and 12.06.  Dr. Joynson, a state agency psychologist, opined in her

report that no Appendix 1 Listing was met by Plaintiff's impairments. (R. 249, 251).  Dr.

Joynson outlined the same functional limitations highlighted by the ALJ in his decision with

respect to the "paragraph B" criteria, and also found that Plaintiff did not meet the "paragraph C"

criteria for these Listings. (R. 255-256).  Additionally, Dr. Matflered indicated that on his final

appointment, December 15, 2005, Plaintiff stated the day was "pretty good." (R. 238).  Dr.

Awad's final assessment of Plaintiff indicated that he was fair in the areas of interacting with

supervisors, dealing with work stress, understanding job instructions, and carrying out job

instructions. (R. 275).  Further, no medical report acknowledges an exacerbation of Plaintiff's

mental conditions by his obesity. (R. 173-266).   Once again, Plaintiff does not point to any

evidence that would contradict the ALJ's finding that Plaintiff's obesity does not render his

impairments medically equivalent to either Listing 12.04 or 12.06.  Accordingly, the ALJ

conducted a proper step three analysis and substantial evidence supports his decision.  *See, e.g.*,

*Burnett*, 220 F.3d at 120; *Diaz*, 577 F.3d at 503-05.

## B.  The ALJ's RFC Determination

In his next argument on appeal, Plaintiff asserts that the portion of the ALJ decision

addressing Plaintiff's Residual Functioning Capacity does contain sufficient analysis.

Specifically, Plaintiff urges that the ALJ's decision is merely "a collection of stock phrases and

off-the-rack analysis." (Pl. Br. 21).

When rendering a determination of an individual's RFC, the ALJ must consider all relevant evidence. *See* 20 C.F.R. § 404.1545(a); *Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001). That evidence includes "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli*, 247 F.3d at 41.  The ALJ must further provide "a clear and satisfactory explanation for the basis on which it rests." *Cotter,* 642 F.2d at 704.  In evaluating medical reports:  "When a conflict in the evidence exists, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason.  The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999).

Here, the Court finds that the ALJ's determination that Plaintiff had the RFC to perform sedentary work limited to simple routine jobs, low stress, low contact, and with various postural limitations is supported by substantial evidence. (R. 15).  In his decision, the ALJ specifically acknowledged the evidence he considered and included a sufficient analysis of the weight accorded that evidence.

With regard to Plaintiff's physical impairments, the ALJ noted that Plaintiff had been diagnosed with "mild" osteoarthritis and that there were no records describing debilitation or deterioration of Plaintiff's condition. (R. 19).  The ALJ afforded weight to the most current imaging conducted by Dr. Bechler which demonstrated that the left knee was normal, that there was an old injury to the right knee, and that there was no acute radiographic abnormality (R. 19). The ALJ also gave weight to the report of Dr. Bagner which noted that, though Plaintiff had crepitus in the left knee, atrophy in the left thigh, and pain and crepitus in the right knee, he was

able to heel to toe walk, had a normal range of motion in the knees, and performed transfers without difficulty. (R. 19).

The ALJ then noted that the accounts relayed in both Plaintiff's testimony and the Third Party Function Report were inconsistent with Plaintiff's subjective pain complaints. (R. 20). Plaintiff testified that he gets up in the morning with his children and tries to do things around the house. (R. 20, 36). The Third Party Functioning Report also indicated that Plaintiff uses the computer, watches television, tries to help with housework, gets out "usually" every day, drives a car, attends his son's sports events, and goes to friends' houses weekly. (R. 20, 143-149). Based upon this evidence, the ALJ appropriately concluded that Plaintiff's complaints were not to be accorded significant weight as they contradicted both the documentary evidence and Plaintiff's daily activities. (R. 20); *see, e.g.*, *Schaudeck v. Commissioner of Social Sec. Admin.*, 181 F.3d 429, 433 (3d Cir. 1999) (the ALJ must evaluate the plaintiff's complaints in conjunction with the objective medical and other evidence of record); *Brown v. Schweiker,* 562 F. Supp. 284, 287 (E.D. Pa. 1983)( the ALJ has discretion "to evaluate the credibility of a claimant and to arrive at an independent judgment in light of medical findings and other evidence regarding the true extent of the pain alleged by the claimant").

With respect to Plaintiff's mental impairments, the ALJ noted the absence of evidence of thought disorders, memory problems, suicidal or homicidal ideations, hallucinations or delusions, problems with alertness, attention span, distractibility, decision-making, or impulsivity. (R. 20). Therefore, although Plaintiff had some mental deficits, the impact was not severe enough to preclude work activity. (R. 20). The ALJ further explicitly acknowledged the opinions of Plaintiff's treating psychiatrist and therapist that Plaintiff was unable to work; however, he did not afford these significant weight because their assessments were based, at least

in part, on Plaintiff's physical impairments, an area which was not their "province." (R. 21); *see*

*Plummer*, 136 F.3d at 429 ("The ALJ must consider all the evidence and give some reason for

discounting the evidence she rejects."). The ALJ gave weight to the opinion of Dr. Awad that

Plaintiff would need a low stress job, and to the opinion of Dr. Joynson, the DDS consultant,

who found Plaintiff capable of sustaining adequate concentration, persistence, and pace,

following simple directions, adapting to workplace changes, and responding to supervision. (R.

21).

Based upon the above, and having reviewed the record evidence, the Court concludes that the

ALJ satisfied his obligation to provide a "clear and satisfactory explanation" of his decision.

*Cotter*, 642 F.2d 700; *see Fargnoli*, 247 F.3d at 41. Therefore, the ALJ's determination that

Plaintiff was able to perform sedentary work, as defined in 20 C.F.R. § 404.1567(a), subject to

certain limitations, is supported by substantial evidence.

### C. Step Five Analysis

In his final argument on appeal, Plaintiff asserts that the Commissioner did not bear his

burden at the fifth step of the sequential analysis. Specifically, Plaintiff alleges that the

hypothetical question posed to the vocational expert rendered the expert's testimony insufficient

evidence because it failed to adequately convey the extent of Plaintiff's mental limitations. (Pl.

Br. 33). Noting Plaintiff's "moderate difficulty in maintaining social functioning" and

"moderate difficulty in concentration, persistence, and pace" considered by the ALJ in his step

three assessment, Plaintiff states that the terms used in the ALJ's hypothetical question, such as

"low stress" and "simple," do not adequately convey these limitations. (Pl. Br. 31).

As previously noted, if the Commissioner fails to satisfy his burden at step five, the claimant

is considered "disabled." *See Yuckert*, 482 U.S. at 146-147. A hypothetical posed by an ALJ

28

must include all of the claimant's "credibly established limitations."  *See Rutherford,* 399 F.3d at 553; *Ramirez v. Barnhart,* 372 F.3d 546, 552 (3d Cir. 2004); *Burns v. Barnhart,* 312 F.3d 113, 122 (3d Cir. 2002); *Plummer*, 186 F.3d at 431.  A hypothetical question that does not reflect "*all of a claimant's impairments that are supported by the record . . . cannot be considered substantial evidence.*" *Ramirez*, 372 F.3d at 552 (citing *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)) (emphasis in original).

The Court finds that the hypothetical posed by the ALJ to the vocational expert adequately portrayed all of Plaintiff's "credible limitations" established by the physical evidence. *Plummer*, 186 F.3d at 431.  The hypothetical posed was as follows:

> If you were to assume for a moment an individual the claimant's age…49.  His education, which is high school plus and he did also attend the policy academy and college but no degree.  And his past relevant work experience.  Just assume for the purposes of the hypothetical that I found him capable of performing the exertional demands of sedentary work as defined in the regulations…If you were to add to that that he would need to avoid—well first of all that, that he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl.  Could never climb ladders, ropes, and scaffolds...That he would need to avoid concentrated exposures to hazards and he would be limited to simple, routine, low stress jobs, in a job that involved at least low contact with the general public or lets say even no contact with the general public.…Would there be other jobs, if those were the only limitations would there be others jobs that such a person could perform?

(R. 46).

This hypothetical includes all of the limitations which the ALJ ultimately determined afflicted Plaintiff.  In fact, the hypothetical mirrors the ALJ's recitation of Plaintiff's residual functional capacity and, thus, represents the limitations the ALJ believed to be credible. (R. 15).  In determining Plaintiff's RFC, the ALJ specifically stated, "[O]nce an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting

effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities." (R. 15).  In doing so, the ALJ considered both the objective and subjective evidence on record (R. 15).  Evaluating this evidence, the ALJ found that Plaintiff was limited to sedentary work and "simple, routine, low stress jobs" in "low contact" settings. (R. 15).  Therefore, as determined by the ALJ, the restriction to settings with low stress and little to no public contact encompasses Plaintiff's moderate limitations in social functioning and concentration, persistence, and pace.

Furthermore, as discussed above, the ALJ's conclusion that the claimant can perform sedentary work with certain limitations is supported by substantial evidence.  There is no indication in the medical record, except for Plaintiff's testimony and that of Plaintiff's treating psychiatrist and therapist, that Plaintiff cannot work a sedentary position with these limitations. (R. 20-21). Because the ALJ did not err in finding Plaintiff's testimony inconsistent with the objective evidence and in declining to accord weight to the opinions of the mental health professionals who based their decisions on Plaintiff's physical impairments, *see supra* Part V(B), the hypothetical adequately conveyed the established limitations determined by the ALJ in his RFC assessment. *Plummer*, 186 F.3d at 429.

Further, although during the examination Ms. Green indicated that a person who had "difficulty maintaining attention and concentration on simple, routine jobs" would be unable to sustain employment, (R. 48-49), it is not necessary for the ALJ to consider this aspect of the expert's testimony as it does not reflect a "credibly established" limitation. *See Rutherford,* 399 F.3d at 554-55; *Plummer,* 186 F.3d at 431.  In response to the posited hypothetical, Ms. Green, the vocational expert, determined that there were jobs in existence in the national market that could be performed by Plaintiff:  pari-mutuel ticket checker, sorter, addresser or stamper, and toy

stuffer. (R. 47-48).  This response was to a hypothetical that, as explained above, fairly set forth every credible limitation established by the physical evidence. Thus, it can appropriately be relied upon as substantial evidence supporting the ALJ's conclusion that the Commissioner met his burden at step five of the analysis and that Plaintiff is not disabled within the meaning of 42 U.S.C. § 423(d). *See Ramirez*, 372 F.3d at 552.

## VI.    CONCLUSION

For the foregoing reasons, the Court concludes that substantial evidence supports the ALJ's decision denying Plaintiff DIB benefits.  Therefore, the Court affirms the final decision of the Commissioner.  An appropriate Order accompanies this Opinion.


                                          /s/ JOEL A. PISANO_____
                                          United States District Judge


Dated: August 2, 2012